
PLAINTIFF'S
EXHIBIT
P-1A

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
Boise, Idaho

File Nos.:   A 77 813 691                         June 12, 2001
             A 77 813 692
             A 77 813 693
             A 77 813 694

In the Matters of              )
                               )
IRMA WAHJUDI SHALIMAR,         )  IN REMOVAL PROCEEDINGS
HENDRA WAHJUDI,                )
CAESAR  WAHJUDI, and           )
CHRYSTA WAHJUDI                )
                               )
            Respondents        )

CHARGE:       Overstay

APPLICATIONS: Asylum - withholding of removal - protection
              under the Convention Against Torture

ON BEHALF OF RESPONDENTS:           ON BEHALF OF SERVICE:

Carmen Diamore-Siah,                Ann M. Tanke,
Ernest A. Hoidal,                   Attorney at Law
Attorneys at Law

ORAL DECISION OF THE IMMIGRATION JUDGE

The respondents in this consolidated case consist of a family with the lead respondent being the mother/wife, the second respondent being the husband/father and the two additional respondents being the respective children aged 16 and 14. They were placed in proceedings by the filing of their Notices to Appear on October 13, 2000. These have been designated as Exhibit 1. The respondents have admitted the allegations and conceded removability.

Respondents declined to designate a country or removal and therefore pursuant to regulation I will designate Indonesia, which is the country of nativity and citizenship.

As Composite Exhibit 2, we have the form I-589 filed by the lead respondent. The family has submitted approximately 500 pages of supporting materials. There is a considerable amount of information pertaining to human rights abuses in Indonesia and associated problems. I'd also take note of information provided by Dr. Dean Belnap who is a board certified psychiatrist and pediatrician who has been very active in the Mormon Church and has written supportive letters and also testified at length. With regard to the information provided by the respondents specific to their claim, beyond the materials offered by Dr. Belnap, I take note of photographs of the sister's cousin's home of Mr. Wahjudi which was destroyed in a May 1998 riot in Indonesia.

As Exhibit 3, we have the <u>Country Report</u>.

As Composite Exhibit 4, we have from the Service the asylum adjudicator's assessment to refer the case, as well as the year 2000 <u>Country Report</u>. It is noted that the asylum adjudicator accepted the respondents' testimony but did not find past persecution nor did he find a sufficient basis to establish a well-founded fear of future persecution.

I recognize that a refugee is entitled to a discretionary grant of asylum. As defined in the Act, a

refugee is an alien who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion."

To establish eligibility for asylum based on a well-founded fear of persecution, an alien must demonstrate that his or fear is both subjectively genuine and objectively reasonable. Ghaly v. INS, 58 F.3d 1425 (9th Cir. 1995). The applicant bears the burden of establishing eligibility for asylum and this includes meeting the objective showing. Fisher v. INS, 79 F.3d 955 (9th Cir. en banc 1996).

If one establishes a clear probability of persecution or of the risk of torture, relief is mandatory and the provisions of law dealing with withholding of removal as well as for protection under the Convention Against Torture. The well-founded fear standard is less than a clear probability. Hence, the failure to meet the easier well-founded fear standard necessarily means that the clear probability test has also not been met.

The crux of this claim is that the respondents fear future persecution and/or torture because they are ethnically Chinese and also followers of the Mormon faith. Mr. Wahjudi, in his testimony, has given what may be viewed as some kind of claim based on political opinion because he asserts that he

A 77 813 691                        3                    June 12, 2001

3

has prepared what may have been viewed as inappropriate political cartoons in that he is an artist. I don't find on basis of this case any viable political opinion claim in that at the most the respondent seems to have received some kind of warning and the political activity which seems to have been involved in criticizing the corruption of the former dictator Suharto has been the subject, as noted in the background materials of a great deal of political discourse and criticism and it is not as though the respondent makes any claim that he has been mistreated, arrested or detained because of some kind of political opinion. He did indicate that he was unable to continue employment as a political cartoonist, but it seems that the newspaper for which he was preparing this work went bankrupt and on that basis he lost him employment. I therefore propose in the course of this decision to concentrate on the claims based on ethnicity and religion.

As noted, the respondents are ethnically Chinese. They come from family members who have lived in Indonesia for several generation.

With regard to past problems that they have experienced in Indonesia, they discussed at length difficulties they had in growing up in a country in which there is animus and discrimination against ethnic Chinese. As Dr. Belnap testified, as in many Southeast Asian countries, Chinese have obtained significant positions in the local

A 77 813 691                4                June 12, 2001

economy and this has created "jealousy" and antipathy by others who are less fortunate and are envious of their status. Dr. Belnap analogized the situation to that of Jews who have had problems in various countries because of their economic success.

As I understand the respondents' testimony, Mr. Wahjudi has three brothers in Indonesia. He himself had the unfortunate incident in August of 1991, while riding on a bus, of being robbed by a Muslim who made anti-Chinese comments to him. This was the only physical act of violence that he has experienced. He has three brothers in Indonesia. With regard to any acts of violence to them, he notes that one brother suffered some kind of injury when, during rioting in apparently 1998, someone threw a rock into his car. Mr. Wahjudi also stated that another brother was robbed by individuals. Other family members that have remained in Indonesia such as his mother and sister have not had any acts of violence directed to them.

Mrs. Shalimar testified that she has had concerns with regard to how people of Chinese ethnicity have been treated, but with regard to any acts of violence directed against her, she reports an incident in 1984 when "an Indonesian guy squeezed my breast." She also has suggested that she was in some way "groped" when she was approximately 15. Other relatives who remain in Indonesia have not been the

subject of physical violence.

The testimony from Mrs. Shalimar was that she was brought up as a Christian and she comes from a family who appear to have been of the Christian faith. At age 23, she converted to become a Mormon. She was employed for 20 years by the church in Indonesia in some kind of supervisory interpreting role. She notes that she wanted to leave Indonesia for some period of time and in 1997 was able to obtain a visa so she could attend a college in Idaho. She expresses the concern that the Indonesian people are hostile to those Indonesian citizens who are Christian and Chinese and she holds the view that she and her family would be at considerable risk if anyone had to return to Indonesia.

Dr. Belnap, who is very active in the Mormon Church, gave further testimony with regard to his evaluation of these respondents and opined that they are depressed over the situation they might face in Indonesia and he has made the further psychiatric diagnosis of post-traumatic stress disorder, as well as a bipolar condition with regard to Mr. Wahjudi. He has had him on a medication for a period of time, but then discontinued that use.

I am prepared to except the factual testimony as presented.

With regard to the claims of Chinese who live in other Southeast Asian countries, I note the decision of <u>Cheo</u>

A 77 813 691                              6                         June 12, 2001

v. INS, 162 F.3d 1227 (9th Cir. 1998). In that case, the Court was considering ethnic Chinese who are citizens of Cambodia. The Court characterized their claim as follows:

> They applied for asylum on the ground that armed groups had tried to recruit them. One temporarily bought his way out [there were two respondents who were brothers] with his watch and the money in his pockets. The armed groups commonly used threats of recruitment to extort money. The other brother was beaten up for not joining. Both had to get themselves smuggled out of the country to avoid recruitments, beatings and extortion. They feared that if they went back to Cambodia they would be shot or tortured by one side if they refused to join, the other if they acceded.

The Court noted, "The Immigration Judge concluded that although they have proved discrimination against ethnic Chinese in Cambodia, it did not rise to the level of persecution for purposes of asylum." The Court concluded as to withholding of deportation that they had "not shown a clear probability of persecution" notwithstanding their claims of "discrimination against ethnic Chinese" and the problems that ethnic Chinese have had in Cambodia.

I certainly recognize that conditions in Indonesia are difficult. That country is going through a good deal of civil turmoil. I do note however that unfortunately there are many countries that are experiencing similar conditions. As the Court held in Singh v. INS, 134 F.3d 962, 967 (9th Cir. 1998), "Mere generalized lawlessness and violence between

A 77 813 691                              7                      June 12, 2001

diverse populations of the sort which abounds in numerous countries and inflicts misery upon millions of innocent people daily around the world generally is not sufficient to permit the Attorney General to grant asylum." In this case, the testimony has been that approximately 10 percent of the 200,000,000 people of Indonesia are ethnic Chinese. The testimony has further been that there are approximately 2,000 active Mormons in Indonesia and about 6,000 more who may not be as active, but are general adherents. Dr. Belnap stated that there are about 25 baptisms of new Mormons each month and that from 16 active recognized churches in 1993, there are now 19 in 2001. The church in the United States is able to support Mormon congregations in Indonesia by sending Bibles, sacraments and other supportive materials.

The Mormons have apparently been registered as a Christian faith in Indonesia and, especially by Muslim standards elsewhere in the world, are permitted on a more generous basis to proselytize than in a great many other Muslim countries.

In evaluating this case, I find it appropriate to review the information prepared by the Department of State in the Country Report in that the Department of State has the statutory responsibility to evaluate human rights conditions. While both sides have submitted the Country Report and obviously the situation is not satisfactory, I cannot find on

A 77 813 691                           8                     June 12, 2001

 

the basis of this record that these respondents have met their burden as provided for by the above case authorities. It is noted, for example, at page 13 of the <u>Country Report</u> under Freedom of Religion, "The constitution provides for religious freedom for members of five out of six officially recognized religions and belief in one supreme God and the government generally respects these provisions ... although the population is over 80 percent Muslim, the practice and teaching of five out of six officially recognized religions generally are respected." It is further noted, "The law states that the government embraces Islam, Protestantism, Catholicism, Buddhism, Hinduism and Confucianism." It is further noted elsewhere with regard to problems of ethnic minorities; that is to say at page 26, "The government officially promotes racial and ethnic tolerance." Additionally, "Racially motivated attacks against Sino-Indonesians have dropped sharply since mid-1998 although Sino-Indonesians continue to report instances of discrimination and harassment." These opinions were presented to the respondents and Dr. Belnap. While they expressed in certain ways their disagreement, they did not dispute the factual predicate upon which the State Department opinions rested and I find that the Department of State's assessment is highly pertinent with regard to the objective component of the claim. I further note the decision of the Board in <u>Matter of J-J-</u>, 21 I&N Dec.

976, 981 (BIA 1997) with regard to an individual seeking asylum as a result of the Liberian civil war which was so egregiously pernicious that for many years Liberians could obtain temporary protected status by determination of the Attorney General. There, the Board noted, "Harm resulting from countrywide civil strife and anarchy is not persecution on account of one of the five enumerated grounds."

While I certainly don't mean to ignore the inappropriate acts of individuals that the respondents have reported as to the incident that Mr. Wahjudi had on the bus in 1991 or acts of violence against certain of the relatives, it is apparent to me that the Mormon Church has maintained its presence in Indonesia and indeed, as noted from the report of baptisms, continues its outreach activities. I am not at liberty to in effect adopt a standard for temporary protected status in considering asylum claims and I find on the basis of this record that the respondents have not met the objective component and I therefore enter the following order.

## ORDER

IT IS HEREBY ORDERED that the applications for relief be denied.

IT IS FURTHER ORDERED that the respondents be given the privilege of voluntary departure by August 12, 2001 upon the posting of a $500 voluntary departure bond.

IT IS FURTHER ORDERED that if the respondents do not

so comply, that they be removed to Indonesia on the charges set forth in their respective Notices to Appear.

Dated this 12th day of June, 2001 at Boise, Idaho

_____
KENNETH JOSEPHSON,
Immigration Judge    10-13-01